### HOGAN v. MAISON LAFITTE.

Industrial Commission.

January 29, 1954.

Clyde T. Windham, West Palm Beach, for claimant.

Samuel E. Dighton, Orlando, for employer and insurance carrier.

JAMES R. KNOTT, Deputy Commissioner.

Maison LaFitte, a restaurant located in Palm Beach, suspends operations during the summer months, customarily opening each year in November, and closing about May 1st of the following year. The claimant, Tillie Hogan, was employed there as a waitress during the season of 1952-1953, and had been so employed for some seven "seasons" prior thereto. It was her custom not to work regularly during the summer, unless her husband, a painter, was unable to find employment, although she occasionally accepted "call work" with private parties or at clubs. During the summers of 1948, 1949 and 1950, however, when her husband was unable to obtain steady employment, she worked regularly as a waitress, to replenish the family finances. She did not work during the summers of 1951 or 1952.

On January 24, 1953 the claimant sustained an injury arising out of and in the course of her employment with Maison LaFitte which caused her to be temporarily totally disabled from the time of her injury through the summer of 1953 and into the autumn season, when she would normally have become reemployed at Maison LaFitte as a waitress. Her average weekly wages at the time of the injury were $67.50. The insurance carrier for the employer paid her compensation for such disability at the rate of $35 per week through April 29, 1953, the approximate closing date of the restaurant, and then suspended compensation payments until November 14, 1953, when the restaurant reopened, and compensation payments were resumed.

Mrs. Hogan claims the right to compensation on account of her disability during the period the restaurant was closed. The carrier, while conceding she was temporarily totally disabled during that period, denies liability for the compensation claimed on the ground that it was not claimant's custom to work during the summer, and that to pay compensation for disability during such period would result in a "profit" on account of her injury, thus violating the spirit and intent of the Act, which is said to be to compensate, in part, for loss of earning capacity by reason of injury. The carrier submitted the following tabulation with reference to its contention—

Average weekly wages—$67.50.  Compensation rate—$35.

Normally works Thanksgiving to May 1—7 days per week.

| | |
|---|---:|
| Average annual earnings | $1,485.00 |
| 11/27/52—5/1/53, exactly 22 weeks @ $67.50. | |
| Actual earnings. | 559.30 |
| 11/27/52—1/24/53, 8 2/7 weeks @ $67.50. | |
| W/C paid 1/28/53 — 4/29/53. | 455.00 |
| 13 weeks @ $35. | |
| Total earnings and W/C | 1,014.30 |
| Loss due to injury | 470.70 |
| Off-season compensation | 990.00 |
| 4/30/53 — 11/14/53, 28 2/7 weeks @ $35. | |
| Less net wage loss, above | 470.70 |
| Resulting profit from injury. | 519.30 |
| Paid in comp. and actual earnings | 1,014.30 |
| Off-season comp. claimed | 990.00 |
| Total | 2,004.30 |
| Less average annual earnings | 1,485.00 |
| Profit | 519.30 |

The claimant testified that her husband was out of work the major part of the time in 1953, until July, and that if she had not been disabled, she would have obtained employment during the periods when he was out of work.

On the basis of the facts stated, a question is presented as to whether, as a matter of law, the claimant is entitled to compensation during the continuance of her temporary total disability due to her injury, subject only to the maximum number of weeks prescribed by the statute, regardless of her customary practice of suspending work during the summer. (In light of the conclusion reached below, the following discussion of the question will omit, as irrelevant, any considerations relating to the existence of a probability that the claimant would have actually engaged in gainful employment during the 1953 summer, had she been able to do so.)

Section 440.02(9), Florida Statutes 1953, defines "disability" as follows—" 'Disability' means incapacity because of the injury to earn in the same or any other employment the wages which the employee was receiving at the time of the injury." Section 440.-15(2) provides as follows— *"Temporary Total Disability.*—In case of disability total in character but temporary in quality, sixty per cent of the average weekly wages shall be paid to the employee

during the continuance thereof, not to exceed three hundred and fifty weeks except as provided in subsection (1) of section 440.12."

It will be noted that the Act defines "disability" as *incapacity to earn*, so that, to adopt the language used by the Supreme Court in Florida Greyhound Lines v. Jones, 60 So. 2d 396, at page 398, "we are not primarily concerned with loss of earnings but with loss of power to earn." Further, the Act provides for the payment of compensation for temporary total disability *during the continuance thereof* (not to exceed a specified number of weeks), and contains no exception for persons of seasonal or other special type of employment.

As applied to the present case and many other individual cases, the failure of the Act to make special provision for persons engaged in seasonal employment may on first consideration appear to have illogical results, not intended by the framers of the Act and not consistent with the spirit of the law. On more careful analysis, however, it becomes evident that the general intent of the Act, as applied to such cases, is based on a recognition of the natural right of an employee to continue to be free to work according to choice or necessity, regardless of whether his right is exercised, and his companion right to be compensated for an injury in the course of employment depriving him of that freedom. The general principle involved was followed by our Supreme Court in the case just cited, above, in application to a common law suit brought by a housewife for personal injury, where the Court used the following language—

"We now reach an instruction that is thought by appellant to have played havoc with the fairness of the trial. The jury was told that if a preponderance of the evidence established the right of the appellee-wife to recover, she was entitled, among other items, to compensation for her diminished earning capacity. This, it is said, was improper because there was no evidence that she had any earning capacity. * * *

The argument against recovery for loss on diminution of ability to earn seems logical, and yet it is not apropos, in the case of a housewife, at least. In the consideration of this question we are not primarily concerned with loss of earnings but with loss of power to earn. We are inclined to adopt the view of the Supreme Judicial Court of Massachusetts, as expressed in Rodgers v. Boynton, 315 Mass. 279, 52 N.E. 2d 576, 151 A.L.R. 475, that a wife may recover for the loss of capacity to earn money, that being an injury to her personal rights.

We can see much reason for the holding because it might well happen that a woman who has never earned a cent but has faithfully and successfully discharged her duties as a wife and mother would suddenly

be faced, by the loss or disability of her mate, with the necessity to earn money to continue maintaining her home and rearing her brood. At any given time before such an emergency she might be wholly unable to prove she had produced a dime, though she might be qualified to expertness in some field or other. The lack of ability to "carry on" because of some injury would immediately become a very real loss.

Certainly the framers of the Act cannot be considered to have overlooked the effect of their omission of special provisions relating to persons engaged in seasonal employment—in view of the fact that a substantial portion of the population is so engaged. Thus, school children who work during the summer do not lose their right to compensation after the beginning of their school term, where they have in fact remained temporarily totally disabled by injury incurred in their work during the summer. Nor does an employee lose his right to compensation for disability during the summer because he happens to be a school teacher who customarily would not work in the summer. Nor, where exemption from the Act is waived by employers of professional athletes, do the latter lose their compensation rights at the end of the annual season of their participation in the particular sport or type of game for which they were engaged.

Counsel for the carrier, in his argument relating to the spirit and intent of the Act, has called attention to the following statement by Hon. Raymond E. Barnes, then chairman of the Florida Industrial Commission, in the preface to the 1951 annotated copy of the Act—

> It has often been erroneously said that the object of the compensation law was to place on industry and society the loss occasioned by accidental injuries and death. This is only partly true. In every instance the employee bears part of the loss, as the compensation act provides that the injured employee shall be paid compensation at the rate of 60% of his average weekly wages during his disability, the rate not to exceed $35 per week. That a part of the loss should fall on the employee is considered fundamental in compensation law so that no employee shall lose one of the primary incentives to avoid accidental injuries.

With all respect for the view of Mr. Barnes, whose knowledge of the Act is well known, his observation that the employee bears part of the loss in every instance is not correct in point of fact, although it is true for most types of compensation cases. For example, a workman who sustains permanent injury to a finger, foot, or other member, is due, as a matter of course, a specified number of weeks' compensation under the Act—regardless of whether he suffered any loss of wages or of actual earning capacity on account of the injury. In many such cases, the employee suffers

no appreciable temporary disability, and no actual loss of earning capacity, as demonstrated by later successive advancements in pay in the same manner as would presumably have occurred in the absence of any injury. Fixed payments for loss of specified members are due even if the claimant during the period of his compensation payments is back at work at higher wages than before. Evidence that claimant has become regularly employed at greater earnings than before is completely immaterial. Larson comments on this as follows, in his text on Workmen's Compensation Law, section 58.10—

> This is not, however, to be interpreted as an erratic deviation from the underlying principle of compensation law—that benefits relate to loss of earning capacity and not to physical injury as such. The basic theory remains the same; the only difference is that the effect on earning capacity is a conclusively presumed one, based on observed probabilities in many similar cases, instead of a specifically proved one, based on the individual's actual wage-loss experience. The effect must necessarily be a presumed one, since it would be obviously unfair to appraise the impact of a permanent injury on earning capacity by looking at claimant's earning record for some relatively short temporary period preceding the hearing. The alternative is to hold every compensation case involving any degree of permanent impairment open for a lifetime, making calculations of the effect of the impairment on claimant's earnings each time claimant contends that his earnings are being adversely affected. To avoid this impossible administrative task, the apparently cold-blooded system of putting average-price tags on arms, legs, eyes, and fingers has been devised.

Thus it is that the provisions of the workmen's compensation laws are not tailored to fit each of the various and innumerable types of individual injuries, with differing wage-loss factors, but are based upon "observed probabilities in many similar cases." They were no doubt properly so designed in order to avoid a multiplicity of issues and factors which otherwise would govern the disposition of the thousands of claims which arise annually from industrial injuries, affecting each claim in a different manner, and destroying simplicity of administration of the law, and its general workability.

In my opinion the carrier in this case is liable for compensation payments to the claimant during the period when they were suspended. It is therefore ordered that the insurance carrier pay— (1) compensation to the claimant at the rate of $35 per week for the period of her temporary total disability beginning April 30, 1953 and ending November 13, 1953; (2) to Clyde Windham, Esq., the sum of $250 as a reasonable fee for his legal services in claimant's behalf.